**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**No. 12-1282 consolidated with No. 13-1295**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────────────

**Louisiana Public Service Commission,**

*Petitioner*

*vs.*

**Federal Energy Regulatory Commission,**

*Respondent*

───────────────

**ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION**

───────────────

**BRIEF FOR PETITIONER**

Brandon Frey
Executive Counsel
Stephen Kabel
Staff Counsel
Louisiana Public Service Commission
Galvez Building - 12th Floor
602 N. Fifth Street
Baton Rouge, Louisiana  70802
Telephone:  (225) 342-9888

Michael R. Fontham
Paul L. Zimmering
Noel J. Darce
Dana M. Shelton
   Of
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200

*Special Counsel to the Louisiana
Public Service Commission*

1163681v.1

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A)  Parties**.  The following are the parties and intervenors in this Court:

>Louisiana Public Service Commission, petitioner.

>Federal Energy Regulatory Commission, respondent.

>Energy Services, Inc., intervenor.

>Arkansas Public Service Commission, intervenor.

>Mississippi Public Service Commission, intervenor,

>Council of the City of New Orleans, intervenor,

>Union Electric Co., d/b/a Ameren Missouri.

The following additional parties intervened before FERC:

>Council of the City of New Orleans, Louisiana

>Arkansas Electric Energy Consumers, Inc.

>City of Nederland, Texas

>City of Port Neches, Texas

>City of Silsbee, Texas

>Louisiana Energy Users Group

>Occidental Chemical Corporation

>East Texas Cooperatives

>City of Osceola, Arkansas

>Sam Rayburn G&T Electric Cooperative, Inc.

>Public Utility Commission of Texas

>Texas Industrial Energy Consumers

- i -

Tex-La Electric Cooperative of Texas, Inc.

**(B)   Rulings under review.**   The following decisions of the Federal Energy Regulatory Commission are under review:

(i)   *Entergy Services, Inc., Opinion No. 505,* 130 FERC ¶61,023 (January 11, 2010).

(ii)   *Entergy Services, Inc., Opinion No. 505-A,* 139 FERC ¶61,103 (May 7, 2012).

**(C)   Related Cases.**   The challenged agency decisions are related to a prior decision of this Court, which dismissed a petition for review filed by the Louisiana Public Service Commission ("LPSC") and affirmed the ruling of the Federal Energy Regulatory Commission ("FERC") that *Opinion No. 480,* 111 F.E.R.C. ¶61,311 (2005), established all aspects of the formula rate required to roughly equalize production costs among the operating companies of the Entergy Corp. electric system.  FERC held, and this Court affirmed, that the formula could not be changed at the request of Entergy or the LPSC in the subsequent Compliance Proceeding.  *Louisiana Public Serv. Comm'n v. FERC,* 2009 U.S. App. LEXIS 15425 (D.C. Cir. 2009 (unpublished).  In contrast, FERC in this case held that Entergy could and did change the formula in the Compliance Proceeding.

This is the first of the annual proceedings established by FERC to permit review of the rates filed under the "Bandwidth Formula" adopted in

1163681v.1

compliance with *Opinion No. 480*.  Orders that FERC issued in the Second and Third Bandwidth Proceedings are under review in the United States Court of Appeals for the Fifth Circuit and involve similar issues.  Issues related to the Orders in the Second Bandwidth Proceeding, including FERC's interpretation of the depreciation provisions in the tariff and an Entergy departure in the Compliance Proceeding from the methodology adopted in *Opinion No. 480,* are under submission after oral argument in *Louisiana Public Service Comm'n v. FERC,* No. 13-60140, cons. w/ No. 13-60141 (5th Cir.).  The Orders in the Third Bandwidth Proceeding are under review in *Louisiana Public Service Comm'n v. FERC,* No. 13-60874 (5th Cir.) and briefing is complete.  The issues include another Entergy change to the formula allegedly made in the Compliance Proceeding and FERC's holding that the formula rate precludes any FERC review to ensure that the annual, changing cost inputs into the formula are just and reasonable.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Louisiana Public Service Commission is a political subdivision of the State of Louisiana.  No corporate disclosure is required.

1163681v.1

# GLOSSARY

| | |
|---|---|
| **ADIT** | Accumulated Deferred Income Taxes. |
| **ANO** | Arkansas Nuclear One Units 1 and 2. Nuclear generating units located in Arkansas and owned by Entergy Arkansas, Inc. |
| **Judge** | A FERC administrative law judge. |
| **APSC** | Arkansas Public Service Commission. |
| **Bandwidth Calculation** | The actual cost determinations and comparison after costs are inputted into the cost categories in the Bandwidth Formula, which produce payments and receipts to eliminate deviations of more than +/- 11% from Entergy System average cost. |
| **Bandwidth Formula or Bandwidth Tariff** | The FERC formula rate designed to bring production costs of all the Entergy Operating Companies to within +/- 11% of the System average. |
| **Bandwidth Proceedings** | The annual proceedings established to review Entergy's annual Bandwidth Calculation. |
| **First Bandwidth Proceeding** | This proceeding, which established rates commencing June 1, 2007. |
| **Second Bandwidth Proceeding** | The second annual proceeding, which established rates commencing June 1, 2008. |
| **Third Bandwidth Proceeding** | The third annual proceeding, which established rates commencing June 1, 2009. |
| **Capital Lease** | The Waterford 3 Sale-Leaseback arrangement, which Entergy accounts for at FERC as a Capital Lease and includes the Capital Lease in the Bandwidth Calculation. |

1163681v.1

| *Compliance Order* | *Order Accepting Compliance Filing, As Modified,* 117 F.E.R.C. ¶61,203 (2006), which implemented the requirements of *Opinion No. 480.* |
|---|---|
| **Compliance Proceeding** | This proceeding in which Entergy filed its written tariff to comply with the formula adopted in *Opinion No. 480.* |
| *Compliance Rehearing Order* | *Order on Rehearing and Compliance,* 119 F.E.R.C. ¶61,095 (2007). |
| **Entergy** | Entergy Corporation, the holding company that owns 100% of the Companies or Entergy Services, Inc., the service company of the Companies. |
| **Companies** | The operating companies that are parties to the System Agreement and wholly owned by Entergy.  The Companies include Entergy Arkansas, Inc., Entergy Gulf States Louisiana L.L.C., Entergy Louisiana, L.L.C., Entergy Mississippi, Inc., Entergy New Orleans, Inc., and Entergy Texas, Inc.  Entergy Gulf States, Inc. separated into Entergy Gulf States Louisiana L.L.C. and Entergy Texas, Inc. as of January 1, 2008. |
| **Exhibits ETR-26 and ETR-28** | Two exhibits Entergy filed in the *Opinion No. 480* proceeding, containing the methodology FERC adopted to compare the production costs of the Companies. |
| **FERC** | Federal Energy Regulatory Commission, Respondent. |
| **Form 1** | Form on which utilities file annual reports with FERC. |
| **LPSC** | Louisiana Public Service Commission, Petitioner. |
| *Opinion No. 480* | *Louisiana Pub. Serv. Comm'n v. Entergy Corp.,* 111 F.E.R.C. ¶61,311 (2005), which required the rough equalization of production costs among the Entergy Companies. |
| *Opinion Nos. 505 and 505-A* | The Orders under review. |

| | |
|---|---|
| ***Opinion Nos. 514 and 514-A*** | FERC's Orders in the Second Bandwidth Proceeding: *Opinion No. 514*, 137 F.E.R.C. ¶61,029 (2012); *Opinion No. 514-A,* 142 F.E.R.C. ¶61,013 (2013). |
| ***Opinion No. 519*** | FERC's Order in a complaint case brought by the LPSC to contest Entergy's depreciation rates, after review of the rates was denied in this proceeding.  FERC ruled that the LPSC's basis for changing the formula, including non-compliance with FERC policy and accounting rules and distortions of the Bandwidth Calculation, and the effect on rates, were insufficient grounds to change the formula.  *Opinion No. 519,* 139 F.E.R.C. ¶61,107 (2012). |
| **Production Costs** | The costs of producing energy for the System's customers -- namely, generation costs and power purchases. |
| **Remedy** | The rough production cost equalization remedy mandated by FERC to keep the Companies' production costs within a +/-11% bandwidth.  The Remedy was implemented through the System Agreement. |
| **Sale-Leaseback** | The sale and leaseback of a portion of the Waterford 3 nuclear plant, owned by Entergy Louisiana L.L.C., which at FERC is accounted for and included in the Bandwidth Formula as a Capital lease. |
| **System Agreement** | The System Agreement, as amended, among Entergy and its Companies that allocates production costs and implements the Remedy. |

1163681v.1

# TABLE OF CONTENTS

PAGE

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT....................................iv

GLOSSARY....................................................................................................v

TABLE OF CONTENTS.................................................................... viii

TABLE OF AUTHORITIES ..................................................................xi

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES...........................................................................2

    1.    Nuclear Depreciation.........................................................................2

    2.    Change of Formula in Compliance Proceeding, Without Notice and in Conflict With FERC Procedural Rule........................................3

    3.    Exclusion of Capital Lease ADIT Based on Retail Ratemaking Treatment.........................................................................................4

STATEMENT OF THE CASE.............................................................................5

    1.    FERC enacts remedy to ensure "rough equalization" of production costs.......................................................................................5

    2.    FERC rules that changes to the Exhibit ETR-26/ETR-28 methodology could not be made in the Compliance Proceeding, and this Court affirms.......................................................................6

    3.    FERC affirms that the justness and reasonableness of all cost inputs entering the formula rate are subject to review in annual Bandwidth Proceedings.......................................................................9

    4.    The evidence shows that Entergy's nuclear depreciation rates are unjust and unreasonable. ..............................................................11

    5.    FERC's rulings..................................................................................21

1163681v.1

SUMMARY OF THE ARGUMENT ................................................................27

    1.    Depreciation. ...........................................................................27

    2.    Retroactive rule change and approval of tariff change without statutory notice. ......................................................................29

    3.    Exclusion of Waterford Capital Lease ADIT.....................................30

STANDING ...................................................................................................30

STANDARD OF REVIEW .............................................................................30

I.    FERC'S DEPRECIATION RULING IS UNLAWFUL AND ARBITRARY. ..........................................................................31

    A.    FERC'S Decision to Vest Authority in Retail Regulators to Set Depreciation Rates for the Companies they Regulate in the Wholesale Cost Allocation Tariff Is an Unlawful Subdelegation of FERC's Power. ...........................................................31

    B.    FERC's Reversals Regarding the Tariff and the Ability to Review the Justness and Reasonableness of Costs Conflicts with the Statute, FERC's Prior Interpretations, and FERC Policy on Formula Rates.........................................................35

    C.    FERC's Determination Is an Unlawful Retroactive Change in Procedure That Prejudices the LPSC. ...........................................40

    D.    FERC's Refusal to Apply Its Accounting Rule Is Arbitrary. ..............42

II.    THE ALLEGED CHANGE OF TARIFF IN THE COMPLIANCE PROCEEDING IS VOID FOR LACK OF NOTICE AND NON-COMPLIANCE WITH THE PROCEDURAL RULE ESTABLISHED FOR THE COMPLIANCE PROCEEDING. ....................43

III.    FERC's RULING ON THE CAPITAL LEASE ADIT IS IRRATIONAL BECAUSE FERC COST OF SERVICE DOES NOT MIMIC RETAIL RATEMAKING.................................................48

CONCLUSION ...............................................................................................51

- ix -

RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE ........................................52

CERTIFICATE .................................................................................................53

STATUTORY ADDENDUM ………………………………………….Addendum

1163681v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel Accardi v. Schaugnessy,* 347 U.S. 260 (1954) ......................42

*\*Alabama Power Co. v. FERC,* 160 F.3d 7 (D.C. Cir. 1998) ..........................11, 12

*\*American Electric Power Service Corp.,* 124 F.E.R.C. ¶61,306 (2008).................................................................................................38

*Arkansas Public Service Comm'n v. Entergy Corp.,* 128 F.E.R.C. ¶61,020 (2009)...............................................................................20

*Arkansas Public Service Comm'n v. Entergy Services, Inc.,* 119 F.E.R.C. ¶61,223 (2007)...................................................................2, 10, 41

*Boston Edison Co.,* 59 F.E.R.C. ¶63,028 (1992) ....................................................12

*Entergy Services, Inc.,* 120 F.E.R.C. ¶61,020 (2007).......................................34, 35

*Entergy Services, Inc.,* 120 F.E.R.C. ¶61,094 (2007).......................................10, 41

*\*Entergy Services, Inc.,* 124 F.E.R.C. ¶61,163 (2008)..............................................8

*\*Handley v. Chapman,* 587 F.3d 273 (5th Cir. 2009) ......................................31, 42

*Louisiana Pub. Serv. Comm'n v. FERC*, 522 F.3d 378 (D.C. Cir. 2008) ........................................................................................................5

*Louisiana Public Service Comm'n v. Entergy Corp.,* 124 F.E.R.C. ¶61,010 (2008)............................................................................8, 11, 41

*Louisiana Public Service Comm'n v. Entergy Services, Inc.,* 139 F.E.R.C. ¶61,100 (2012)..................................................................................8

*Louisiana Public Service Comm'n v. FERC,* 184 F.3d 892 (D.C. Cir. 1999) ......................................................................................................31, 40

*Authorities upon which we chiefly rely are marked with an asterisk.

1163681v.1

*Louisiana Public Service Comm'n v. FERC,* 2009 U.S. App. LEXIS
15426 (D.C. Cir. 2009) ...................................................................7

*Louisiana Public Service Comm'n v. FERC,* 2009 U.S. LEXIS 15426
(2009) at \*\*2 (unpublished) ...........................................................3

\**McDonald v. Watt,* 653 F.2d 103 (5th Cir. 1981)............................................42, 49

*Midwest Power System,* 67 F.E.R.C. ¶61,076 (1994)..............................................12

*Mississippi Industries v. FERC,* 808 F.2d 1525 (D.C. Cir. 1987)...........................32

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S.
354 (1988)...................................................................................32

*Municipal Light Bds v. FPC,* 450 F.2d 1341 (D.C. Cir. 1971), *cert.
denied,* 405 U.S. 989 (1972).......................................................40

*NLRB v. E&B Brewing Co.,* 276 F.2d 594 (6th Cir. 1960) ....................................42

*North Alabama Express, Inc. v. United States,* 585 F.2d 783 (5th Cir.
1978) .........................................................................................49

*Ohio Edison Co.,* 84 F.E.R.C. ¶61,157 (1998) ...................................................12, 13

\**Pacific Molasses Co. v. Federal Trade Comm'n,* 356 F.2d 386 (5th
Cir. 1966)...................................................................................41, 49

\**Public Service Comm'n of Kentucky v. FERC,* 397 F.3d 1004 (D.C.
Cir. 2005)...................................................................................48

\**Public Service Elec. and Gas Co.,* 124 F.E.R.C. ¶61,303 (2008) ...............9, 38, 40

\**Public Utility Comm'n of the State of California v. FERC,* 254 F.3d
250 (D.C. Cir. 2001)
...........................................................................37, 39, 40

*Texas Office of Pub. Util. Couns. v. FCC,* 265 F.3d 313 (5th Cir.
2001) .........................................................................................34

xii -

\*Authorities upon which we chiefly rely are marked with an asterisk.

1163681v.1

*Transwestern Pipeline Co. v. FERC,* 897 F.2d 570-580 (D.C. Cir. 1990) ................................................................................47

*\*United States Telecom Ass'n v. F.C.C.,* 359 F.3d 554 (D.C. Cir. 2004)

................................................................31, 33, 34, 35

**Statutes**

*\*18 C.F.R. Pt. 101, *Gen'l Instr.* 22(A)........................................12, 42, 43

18 C.F.R. § 341.2(c)............................................................45

16 U.S.C. § 824(d) .....................................................1, 31, 36, 39, 44

xiii -

*Authorities upon which we chiefly rely are marked with an asterisk.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to Section 313(b) of the Federal Power Act. 16 U.S.C. § 825*l*(b). This proceeding was instituted by the timely filing of a petition for review of a final Order on rehearing of the Federal Energy Regulatory Commission ("FERC").

FERC had jurisdiction pursuant to the Federal Power Act. 16 U.S.C. §§ 824d and 824e. FERC issued *Opinion No. 505* on January 11, 2010. 130 F.E.R.C. ¶61,023 (2010). [J.A. ___]. The Louisiana Public Service Commission ("LPSC") applied for rehearing, and on May 7, 2012, FERC issued *Opinion No. 505-A*. 139 F.E.R.C. ¶61,103 (2012). [J.A. ___]. The LPSC filed its petition for review on July 5, 2012. The case was held in abeyance for FERC to determine an additional rehearing request of Entergy Services, Inc. Entergy's petition for review of that determination is consolidated with this case.

- 1 -

## STATEMENT OF THE ISSUES

This case involves the First Bandwidth Proceeding filed by Entergy, to permit review of the rates established to achieve the "rough equalization" of production costs among the Entergy Operating Companies ("Companies") for the period commencing June 1, 2007. FERC said it created the annual proceedings to allow "the Commission and all interested parties the opportunity to analyze all production-related costs of each of the Entergy Operating Companies to make sure all such costs are just and reasonable and prudently incurred." *Arkansas Public Service Comm'n v. Entergy Services, Inc.,* 119 F.E.R.C. ¶61,223 (2007), ¶62,306. The issues are:

**1.** ***Nuclear Depreciation.*** After establishing the Bandwidth Proceedings to permit review of the justness and reasonableness of all cost inputs entering the formula rate, did FERC act arbitrarily in ruling that it would not review the justness and reasonableness of the nuclear depreciation cost inputs entering the formula, but instead would permit retail regulators to establish the depreciation inputs for the Companies they regulate, regardless of the discriminatory impact on the rough equalization calculation, where:

a. FERC's interpretation of the formula unlawfully subdelegates its own ratemaking jurisdiction;

- 2 -

b.    The nuclear depreciation rates concededly conflict with FERC ratemaking and accounting policy;

c.    Entergy chose not to update its nuclear depreciation rates for Entergy Arkansas, Inc. ("EAI"), to recognize nuclear license life extensions for EAI's nuclear plants, because Entergy wished to minimize EAI's bandwidth payments; and

d.    FERC's direction of the issues to a "future" Section 206 case prevented any potential consumer remedy for the 2007 rate-effective period.

2.    ***Change of Formula in Compliance Proceeding, Without Notice and in Conflict With FERC Procedural Rule.***    In the Compliance Proceeding Entergy filed to secure approval of its stated formula tariff that purportedly would comply with *Opinion No. 480,* FERC ruled that neither Entergy nor any other party could propose changes to the formula FERC adopted in *Opinion No. 480*, which was based on the methodology used to create Exhibits ETR-26 and ETR-28 in the underlying proceeding.  Entergy subsequently filed a restated tariff and assured FERC that it complied in all respects with the Exhibits ETR-26/ETR-28 methodology and FERC accepted that assurance.  With respect to FERC's rejection of changes proposed by the LPSC, this Court affirmed, holding that *Opinion No. 480* was a final determination that established all elements of the rate and the LPSC should have sought rehearing of that Order.  *Louisiana Public*

- 3 -

*Service Comm'n v. FERC,* 2009 U.S. APP. LEXIS 15426 (2009) at **2, 4 (unpublished).  The issues are:

a.      Given its prior ruling that the methodology could not be changed in the Compliance Proceeding, did FERC's ruling arbitrarily allow Entergy to change the methodology in that proceeding, even though Entergy stated that its formula complied in all respects with the ETR-26/ETR-28 methodology?;

b.      Is FERC's approval of the change in methodology an unlawful retroactive approval of rate changes without the required statutory notice?

**3.     *Exclusion of Capital Lease ADIT Based on Retail Ratemaking Treatment.*** One of the changes to the Exhibit ETR-26/ETR-28 methodology that the LPSC challenged was Entergy's exclusion of numerous categories of ADIT, contrary to that approved methodology.  The LPSC relied on the *Compliance Orders.*  FERC rejected the LPSC's contention, holding that tariff language allowed Entergy to choose categories not generally and properly includable for FERC cost of service purposes.  FERC did not rule on specific categories of ADIT, except ADIT for Net Operating Losses.  In the Second Bandwidth Proceeding, the LPSC challenged Entergy's exclusion of ADIT for the Waterford 3 Sale-Leaseback, which is accounted for at FERC as a Capital Lease.  FERC held that the ruling in this case approved the exclusion of the Capital Lease ADIT because it is not included *in retail rates.*  On rehearing, FERC

- 4 -

acknowledged that its decision in this case may have "ruled on the exclusion of the Waterford 3 ADIT on an incorrect premise," but nevertheless refused to determine the issue. *Opinion No. 514-A,* 142 F.E.R.C. ¶61,013 (2013), ¶25. [J.A. ___]. The issue is: Was FERC arbitrary in determining that ADIT could be excluded as "not generally and properly includable for FERC cost of service purposes" when the Capital Lease to which it relates *is recognized* at FERC, but is ignored for retail ratemaking, and retail ratemaking generally is irrelevant to the FERC Bandwidth Tariff?

## STATEMENT OF THE CASE

1.    *FERC enacts remedy to ensure "rough equalization of production costs."*  Following precedent requiring that the costs of producing electricity on the Entergy Corp. ("Entergy") electric system be at least "roughly equal" among the Entergy operating companies ("Company" or "Companies"), FERC created a "bandwidth" remedy requiring that each Company's costs be within 11 percent of the Entergy System average. *See Opinion No. 480,* 111 F.E.R.C. ¶61,311 (2005) ("*Opinion No. 480*"); [J.A. ___]; *Louisiana Pub. Serv. Comm'n v. FERC*, 522 F.3d 378 (D.C. Cir. 2008). FERC required Entergy in a Compliance Filing to include a "Bandwidth Formula" in the Entergy System Agreement, which is a FERC tariff that provides for central planning of generating units and the allocation of the associated costs.

- 5 -

FERC directed Entergy to follow the methodology Entergy used to compare Company production costs in Exhibit ETR-26, filed in the *Opinion No. 480* proceeding.  *Opinion No. 480,* ¶33.  [J.A. ___].  Subsequently, in its *Compliance Order,* FERC noted that the detailed production cost methodology was reflected in Exhibit ETR-28.  117 F.E.R.C. ¶61,203 (2006), ¶63.  [J.A. ___].  The formula compares Company production costs and requires payments and receipts to eliminate deviations greater than 11 percent from each Company's share of System average cost.  The Bandwidth Formula is typical of many FERC formula rates; it specifies FERC accounts and other sources of data to be used, but not the actual cost amounts.  [ESI-4, § 30.12].  [J.A. ___].

## 2.     *FERC rules that changes to the Exhibit ETR-26/ETR-28 methodology could not be made in the Compliance Proceeding, and this Court affirms.*

In the Compliance Proceeding, Entergy represented that its proposed tariff generally followed the methodology underlying Exhibits ETR-26 and ETR-28, but Entergy stated that two changes had been made, including a change to correct an error in a tax calculation.  *Order Accepting Compliance Filing, As Modified,* 117 F.E.R.C ¶61,203 (2006) ("*Compliance Order*"), ¶64.  [J.A. ___].  Additionally, the LPSC proposed a change to implement the parties' agreement to treat interruptible loads in a manner consistent with FERC's decision in another proceeding, and to ensure that an adjustment that FERC approved for the Vidalia

- 6 -

hydroelectric plant would be consistent with how FERC described it in *Opinion No. 480*. *Id.,* ¶¶56, 57. [J.A. ___]. FERC rejected all these changes.

FERC held that changes to the Exhibit ETR-26/ETR-28 methodology could not be made in the Compliance Proceeding. It said: "This is a compliance filing and Entergy must comply with the requirements of Opinion Nos. 480 and 480-A." *Id.,* ¶63. [J.A. ___]. FERC said: "Any time Entergy seeks to make a change, *e.g.,* a change to return on equity, it must make a section 205 filing with the Commission." *Id.,* ¶69. [J.A. ___]. FERC similarly rejected the proposals of the LPSC. *Id.,* ¶¶59, 62. [J.A. ___]. FERC directed customers to file change under Section 206. *Id.,* ¶69. [J.A. ___].

The LPSC appealed FERC's decision, but this Court affirmed. *Louisiana Public Service Comm'n v. FERC,* 2009 U.S. App. LEXIS 15426 (D.C. Cir. 2009) (unpublished). The Court held that the LPSC should have raised its objections on rehearing of *Opinion No. 480,* which adopted the ETR-26 methodology. *Id.* at **4. The Court found that "ETR-26's methodology applied to all aspects of the rough equalization analysis." *Id.* According to the Court, once *Opinion No. 480* became final, the LPSC could not seek enforcement of the parties' agreement concerning interruptible load in the Compliance Proceeding, or to conform the Vidalia repricing to FERC's description in *Opinion No. 480. Id.* at **4-**5. The LPSC did file a complaint in 2007 on these issues, and FERC

- 7 -

accepted the change for interruptible load, but did not do so until five years after the complaint was filed. *Louisiana Public Service Comm'n v. Entergy Services, Inc.,* 139 F.E.R.C. ¶61,100 (2012).

In subsequent rulings, FERC reiterated the requirement that the only way to change the ETR-26/ETR-28 methodology was through a Section 205 or 206 proceeding. Entergy proposed to change the "Energy Ratio" for calculating variable production costs in 2008. FERC reiterated "that Entergy should make a filing pursuant to section 205 of the Federal Power Act (FPA) if it desired to make any changes to the methodology in Exhibits ETR-26 and ETR-28." *Entergy Services, Inc.,* 124 F.E.R.C. ¶61,163 (2008), ¶3. [J.A. ___]. FERC also restated its requirement in *Louisiana Public Service Comm'n v. Entergy Corp.,* 124 F.E.R.C. ¶61,010 (2008), ¶3.

After FERC rejected the proposed changes in the Compliance Proceeding, Entergy filed a new tariff and represented that it conformed in every detail to the Exhibit ETR-26/ETR-28 methodology. FERC reviewed Entergy's representations of compliance in *Order on Rehearing and Compliance,* 119 F.E.R.C. ¶61,095 ("*Compliance Rehearing Order*"). [J.A. ___]. It listed the changes Entergy made to "reflect the methodology in Exhibit ETR-26 and ETR-28." *Compliance Rehearing Order*, ¶48. [J.A. ___]. Entergy stated that it had eliminated all changes in order to comply with the Commission's directive in

- 8 -

its November, 2006 *Compliance Order*.  It said:  "All of these adjustments have been eliminated and the Tariff has been revised to reflect the methodology reflected in Exhibits ETR-26 and ETR-28."  [LC-303 at 6].  [J.A. ___].  FERC said:  "Entergy revised section 30.12 to reflect the methodology in Exhibit ETR-26 and ETR-28."  *Compliance Rehearing Order,* ¶48.  [J.A. ___].  FERC concluded:  "Upon review of the filing, we find that Entergy has modified its System Agreement so that it is now in accordance with the November 2006 Order."  *Id.,* ¶50.  [J.A. ___].

> **3.    *FERC affirms that the justness and reasonableness of all cost inputs entering the formula rate are subject to review in annual Bandwidth Proceedings.***  Entergy filed the Bandwidth Tariff as a formula rate, which specifies required sources of data but does not contain specific cost inputs.  The formula remains constant, but the cost inputs change periodically and change the stated rates.  FERC cannot know the inputs when it approves the formula; therefore, FERC policy provides that the inputs are always subject to review for justness and reasonableness, either through the review of required utility filings or after the fact, in Section 206 proceedings.  The utility retains the burden to establish the reasonableness of the costs and the resulting rates.  *Public Service Elec. and Gas Co.,* 124 F.E.R.C. ¶61,303 (2008), ¶17.  FERC has ruled that this "policy applies to all formula rates, regardless of type."  *Id.,* ¶20.

- 9 -

After approving the Bandwidth Formula, FERC made clear that it would review the reasonableness of all cost inputs to the formula in annual Bandwidth Proceedings.  It dismissed a complaint filed by the Arkansas Public Service Commission ("APSC"), holding that justness and reasonableness challenges should be raised in Bandwidth Proceedings.  *Arkansas Pub. Serv. Comm'n v. Entergy Services, Inc.,* 119 F.E.R.C. ¶61,223 (2007).  [J.A. ___].  FERC declared that it established these proceedings to "make sure all [production-related] costs are just and reasonable and prudently incurred," holding that examining them in a different proceeding "would be duplicative of the Commission's efforts in establishing these annual proceedings." *Id.,* ¶47.  [J.A. ___].  In its Order setting this Bandwidth Proceeding for hearing, FERC said that its "determination necessarily will be based on underlying cost inputs and the reasonableness thereof. . . ." *Entergy Services, Inc.,* 120 F.E.R.C. ¶61,094 (2007), ¶¶11, 16 ("*Hearing Order*").  [J.A. ___].

Despite FERC's rulings, Entergy and the APSC contended in this proceeding that the reasonableness of cost inputs could not be reviewed in Bandwidth Proceedings.  Therefore, the LPSC filed a precautionary complaint on depreciation and a number of other cost issues.  FERC dismissed the complaint on those issues, holding that the issues were to be litigated in this Bandwidth Proceeding and "there is no need to establish a separate proceeding to address

- 10 -

them." *Louisiana Pub. Serv. Comm'n v. Entergy Corp.,* 124 F.E.R.C. ¶61,010 (2008), ¶27.

**4.** ***The evidence shows that Entergy's nuclear depreciation rates are unjust and unreasonable.*** The just and reasonable issue in this case related to the nuclear service lives used by Entergy to estimate the amount of depreciation cost attributable to the test year for three of the Companies. Depreciation expense is not a cash outlay; it is an allocation of the investment in an asset so it can be expensed during the time it provides service. Depreciation expense is a large component of production costs. To the extent the estimates are based on inconsistent methodologies and produce inaccurate allocations, they distort the allocation of production costs among the Companies. The Bandwidth Formula is designed to bring the Companies to within a precise +/- 11 percent bandwidth; it cannot do so if estimates of costs are inaccurate.

FERC has always regulated the depreciation expense allocations that enter wholesale rates. As explained by this Court in *Alabama Power Co. v. FERC,* 160 F.3d 7, 8 (D.C. Cir. 1998), "[b]ecause a higher depreciation charge implies that the utility should be permitted a higher rate and conversely a lower depreciation charge implies that the utility should be allowed a lower rate, one would expect both the Commission and the utilities it regulates to have a keen interest in the accurate measurement of depreciation." Thus, FERC has always regulated

- 11 -

"depreciation accounting by utilities" as part of its power "to regulate the rates utilities can charge to consumers." *Id.* at 8. FERC had not previously regulated depreciation accounting where it was "not implicated in a ratemaking proceeding," although Congress gave it that authority in Section 302 of the Federal Power Act. *Id.* The Court held that the statute was not self-executing, but in response, FERC adopted a rule to govern depreciation accounting. *Order No. 618,* 92 F.E.R.C. ¶61,078 (2000). FERC thus exercises jurisdiction over depreciation for ratemaking and accounting.

The main requirements in the accounting rule are that utilities depreciate their assets in a "systematic and rational manner" over the "service life of the property." 18 C.F.R. Pt. 101, *Gen'l Instr.* 22(A). The standard is the same for FERC ratemaking. *Boston Edison Co.,* 59 F.E.R.C. ¶63,028 at 65,238 (1992). To the extent state-approved rates differ from the FERC standard, FERC has required that FERC-compliant costs be recorded and the differences stated separately as regulatory assets or liabilities. *Ohio Edison Co.,* 84 F.E.R.C. ¶61,157 (1998). FERC also has a policy that utilities must recognize changes in service lives, and may not "simply 'sit on'" depreciation changes until the utility decides it is "most auspicious . . . to seek their recovery in retail rates." *Midwest Power System,* 67 F.E.R.C. ¶61,076 at 61,029 (1994).

- 12 -

The Bandwidth Formula contains different descriptions of the cost variables related to depreciation. Variable "NAD," the "Nuclear Accumulated Provision for Depreciation and Amortization," identifies this component as amounts recorded in relevant FERC Form 1 accounts and adds: "approved by the retail regulator having jurisdiction over the Company, *unless FERC determines otherwise*." [ESI-4 at 48C-48D (emphasis added)]. [J.A. ___]. "ADXN," the accumulated depreciation component for non-nuclear generators, has the same "unless" language, as does the same provision for general plant ("GAD"). [*Id.* at 48F, 48G]. [J.A. ___]. The depreciation expense variable for nuclear plants and non-nuclear plants both refer to the relevant FERC Form 1 accounts and add in virtually identical language: "as approved by Retail Regulators, *unless the jurisdiction for determining the depreciation and/or decommissioning rate is vested in the FERC under otherwise applicable law*." [*Id.* at 48F ("NDE") (emphasis added); 48H ("DENX")]. [J.A. ___]. The depreciation expense variable for general plant refers to the FERC Form 1 account and makes no reference to retail regulators. [*Id.,* at 48-I ("GDX")]. [J.A. ___].

The reasonableness of depreciation rates was not an issue in the *Opinion No. 480* proceeding. The Entergy methodology adopted by FERC, reflected in Exhibits ETR-26 and ETR-28 in that case, covered the years 1983-2002 and the rates changed over that period. *Opinion No. 480*, 111 F.E.R.C.

- 13 -

¶61,311, ¶¶31, 33.  [J.A. ___].  Exhibit ETR-28 simply identified a page in the FERC Form 1 as the source of depreciation expense.  [ESI-10 at 8].  [J.A. ___].

The license lives of the Arkansas Nuclear One ("ANO") Units 1 and 2 were extended from 40 to 60 years prior to 2006, the first test year for the Bandwidth Formula.  If Entergy Arkansas, Inc. ("EAI") had accurately estimated depreciation using the correct service lives, the change would have reduced its production costs and, in turn, increased its bandwidth obligation.  If it did not recognize the service life changes, Entergy could effectively export excess depreciation expense to other Companies through the Bandwidth Calculation.  Entergy performed an analysis in 2006 of the bandwidth effect of not recognizing the change in service life until 2013, when EAI planned to withdraw from the System Agreement.  Because it was substantial, Entergy chose not to file for a change in depreciation rates with the APSC.

An employee in Entergy's "Regulatory Strategy" department performed an analysis of the amount EAI would save in total depreciation expense if it delayed recognizing the reduced depreciation cost until after its planned withdrawal from the System Agreement.  Effectively, EAI could export future capital costs through the Bandwidth Formula.  The study showed that EAI could transfer its capital costs to other jurisdictions by leaving its depreciation rates at incorrect, excessive levels.  Entergy concluded EAI could avoid hundreds of

- 14 -

millions of dollars of capital costs through this strategy. [Ex. LC-112 at LR 28301]. [J.A. ___]. Using the incorrect depreciation expense, EAI would record $69 million of depreciation cost each year rather than the correct $32.3 million. Of the difference -- $36.7 million -- the Bandwidth Formula would export $29.4 million annually by lowering EAI's bandwidth obligations. [LC-112]. [J.A. ___].

An EAI executive, after reviewing the analysis, stated:

> Given the assumptions, EAI customers would pay an absolute $500 million more if depreciation rates were reduced now based on reflecting the longer ANO lives compared to leaving the depreciation rates the way they are for now, but reducing them after the SA remedy payments are over. On a PV basis, the figure is about $230 million. Is that right?

[*Id.*]. The analyst responded: "Yes, you are correct." [*Id.*]. Therefore, in violation of FERC precedent, Entergy decided to "sit on" the change in service lives.

Prior to a retail rate case EAI filed in 2006, Entergy and/or EAI representatives met several times with members of the APSC Staff or the APSC Commissioners' advisory staff. [*See* LC-111]. [J.A. ___]. According to Entergy, it made a presentation concerning the operation of the bandwidth and informed the APSC that EAI did not intend to file a depreciation study. [*Id.*]. Although the APSC had recognized the life extensions in calculating decommissioning costs for an annual rate rider, the APSC permitted EAI to include depreciation charges for

- 15 -

retail ratemaking based on incorrect nuclear service lives. [LC-179 at 149-50 (Entergy deponent Frits); [J.A. ___]. LC-184 at 133-34 (Entergy deponent Strickland)]. [J.A. ___].

After these facts were revealed in discovery, a FERC Staff witness "rather bluntly" testified "that he believes the nuclear depreciation expenses for Entergy Arkansas' two nuclear units, ANO 2 and ANO 2, 'may have been manipulated' for the purpose of reducing Entergy Arkansas' Bandwidth payments. . . ." [I.D., ¶463]. [J.A. ___]. After the APSC filed a motion to strike, he withdrew the allegation, but testified "that the fact that Entergy/Entergy Arkansas considered impacts on Entergy Arkansas' MSS-3 Bandwidth payments in their examination of Entergy Arkansas nuclear production depreciation rates . . . makes depreciation and decommissioning rates determined by retail regulators unreasonable for depreciation-related cost inputs to the 2006 Bandwidth Calculation." [S-18 at 17]. [J.A. ___]. He asserted that the retail depreciation rates were unjust and unreasonable, and FERC needed to "determine otherwise," pursuant to the tariff's specification of retail regulator-approved inputs "unless FERC determines otherwise." [*Id.*].

The Initial Decision made extensive findings that the nuclear depreciation lives, and particularly those approved by the APSC, were unjust and unreasonable. 124 F.E.R.C. ¶63,026 (2008) ("I.D."). [J.A. ___]. The judge relied

- 16 -

on testimony from the FERC Staff and LPSC, and FERC precedent.  The Staff depreciation expert testified that the depreciation rates should be determined consistently.  As the Initial Decision found, "[h]e therefore believes . . . that the depreciation and decommissioning expense be based upon the remaining life as determined by the duration of the [NRC] license."  [I.D., ¶444].  [J.A. ___].  Specifically, "units ANO 1 and ANO 2 should reflect the approved license extension for both decommissioning and depreciation."  [*Id.*].  Another Staff witness explained the potentially discriminatory effects on the Bandwidth Calculation of inconsistent methodologies employed by retail regulators.  [I.D., ¶455].  [J.A. ___].

The Initial Decision found that "only by following the cited precedent and adopting the FERC Staff position, will there ever be any consistency in establishing appropriate expenses for nuclear depreciation and decommissioning, for purposes of determining the Bandwidth calculations."  [I.D., ¶449].  [J.A. ___].  The judge determined that the "nuclear depreciation and decommissioning-related costs . . . are not just and reasonable and are also discriminatory and preferential."  [I.D., ¶695].  [J.A. ___].  He explained:

> The acceleration of EAI's nuclear depreciation is unjust and unreasonable because it moves artificial depreciation costs into the period in which EAI expects the Bandwidth to exist and artificially lowers depreciation expense thereafter.

- 17 -

[I.D., ¶694].  [J.A. ___].  The judge declined to find that the APSC manipulated the tariff, but found that the "potential for manipulation" was a relevant concern and FERC's exercise of jurisdiction was "essential in order to provide no incentive for manipulation."  [I.D., ¶466].  [J.A. ___].

Relying on the testimony of a former Chief Accountant at FERC, who testified for the Staff, the Initial Decision also found that the nuclear depreciation rates violate FERC accounting requirement.  [I.D., ¶¶469-75].  [J.A. ___].  The witness testified that *Order No. 618* and the accounting regulation "require an electric utility company to depreciate its asset retirement costs associated with nuclear production plant investment in a systematic and rational manner over the service life of the property."  [I.D., ¶474].  [J.A. ___].  She concluded that "Entergy has failed to comply with these [Commission accounting] requirements."  [I.D., ¶475].  [J.A. ___].

The judge also reviewed the deposition testimony of an APSC depreciation expert, whose pre-filed testimony was withdrawn after the deposition. The witness testified that failing to update depreciation for a nuclear license extension over-recovers depreciation expense, is unfair to ratepayers, uses a life that is too short, and "[a]bsolutely" is "disgusting from a consumer point of view." [I.D., ¶468].  [J.A. ___].  He said:  "Absolutely.  It's horrible.  Yes, it is, all of those things."  [*Id.*].

- 18 -

The Initial Decision concluded that "[w]hile it can easily be said that the APSC's failure to readjust the depreciation expenses when the NRC granted the license extensions does not comport to any reasonable accounting standard or established FERC precedent, nor did any party present any evidence as to the reasoning for maintaining a forty-year depreciation life, the APSC can readily for retail rate purposes establish whatever rate it deems appropriate."  [I.D., ¶483].  [J.A. ___].  The judge determined, however, that FERC has final say over the depreciation rates used in wholesale rates, and "[t]hat authority is expressly spelled out in the Service Schedule MSS-3 tariff."  [I.D., ¶484].  [J.A. ___].  He required Entergy to recalculate the nuclear depreciation expenses consistent with FERC policy and precedent.  [I.D., ¶492].  [J.A. ___].

After the judge's ruling, the APSC brought a complaint at FERC to remove the "unless" language and provide authority to retail agencies to set depreciation for their own jurisdictional Companies for the Bandwidth Formula. FERC rejected the complaint.  It said:

> In order for the bandwidth calculation to provide a just and reasonable result under the FPA, the Commission must ensure that the inputs used to calculate the bandwidth are also just and reasonable.  In other words, the authority to determine the payments under the bandwidth necessarily must include the ability to examine the inputs used to calculate . . . depreciation. . . . Therefore, the language at issue is appropriate and

- 19 -

consistent with the Commission's authority under the FPA.

*Arkansas Public Service Comm'n v. Entergy Corp.,* 128 F.E.R.C. ¶61,020 (2009), ¶25. FERC later reversed its interpretation, and the decision is on appeal at the Fifth Circuit.

In the Second Bandwidth Proceeding, litigated prior to *Opinion No. 505,* the outdated service life assumptions in all the retail depreciation rates were at issue. The judge in that case ruled that the depreciation rates were based on studies performed in the 1986-1998 period and were outdated, indicating that the rates may be unjust and unreasonable. *Initial Decision*, 128 F.E.R.C. ¶63,015 (2009), ¶213. [J.A. ___]. He accepted Entergy's commitment to file new studies and held they would provide the basis for establishing depreciation for the Bandwidth Formula. Id., ¶228. [J.A. ___].

Entergy and the APSC did not attempt to justify the depreciation rates in this case or in the Second Bandwidth Proceeding. Instead, they argued that the tariff should be interpreted to preclude changing the depreciation rates established by retail regulators. The judge in the Second Bandwidth Proceeding rejected this proposition. He held that the Federal Power Act requires FERC to ensure that the rates in the Bandwidth Formula are just and reasonable. He added: "There is

- 20 -

nothing in the Act which allows the Commission to delegate this responsibility to any person or body politic." *Id.*, ¶211.  [J.A. ___].

     **5.**    ***FERC's rulings.  a.  Depreciation.***  FERC did not take issue with any of the judge's findings concerning the nuclear depreciation rates.  In fact, FERC said:   "Indeed, while the Presiding Judge contends that adjusting the depreciation rates of ANO 1 and ANO 2 would be more equitable for ratepayers (and upon which we take no issue). . . ."  *Opinion No. 505,* ¶173.  [J.A. ___]. Moreover, FERC affirmed the judge's finding concerning FERC's authority to establish depreciation rates in a wholesale rate:  "There is no question that the Commission has the authority to determine depreciation and decommissioning expenses for purposes of setting a wholesale rate." *Id.*  [J.A. ___].  Further, FERC again determined that the "unless" clauses in the depreciation provisions of the tariff confirmed FERC's authority to adjust the depreciation cost inputs in a bandwidth proceeding. *Id.,* ¶172.  [J.A. ___].

     Nevertheless, FERC reversed the judge's ruling.  With no attempt to reconcile any of its previous pronouncements concerning review of the justness and reasonableness of cost inputs in the Bandwidth Proceedings, and its dismissal of the LPSC complaint on depreciation, FERC ruled that the Bandwidth Proceeding was *not* the proper proceeding to determine the issue.  FERC found that despite the tariff language, "we will not [determine reasonable depreciation

- 21 -

expenses] in a proceeding established to determine the actual production costs of the Operating Companies for 2006." *Id.* FERC said the Bandwidth Proceeding is "not about what production costs would have been if different depreciation rates had been in effect in 2006, but simply about applying the formula using actual 2006 data." *Id.,* ¶173; [J.A. ___]. FERC said that equitable treatment for ratepayers "is a matter solely for a future section 205 or 206 proceeding, not this bandwidth remedy proceeding." *Id.*

In subsequent cases, FERC confirmed its new stance concerning review of the justness and reasonableness of costs. In an *Order Denying Interlocutory Appeal* in the Third Bandwidth Proceeding, FERC acknowledged that its prior rulings "could be interpreted as suggesting that parties had the opportunity in Entergy's annual bandwidth filings to challenge the reasonableness of any cost inputs" to the formula, but said those statements "did not benefit from experience in addressing these annual bandwidth filings." *Order Denying Interlocutory Appeal,* 130 F.E.R.C. ¶61,170 (2010), ¶20. [J.A. ___]. FERC said the only focus is whether Entergy "correctly applied the actual Form 1 data and the depreciation rates for its annual bandwidth filings." *Id.,* ¶19. [J.A. ___].

FERC went further in the Second Bandwidth Proceeding, reversing its interpretation of the tariff and finding that the "ambiguous" language precluded FERC from asserting its own jurisdiction. *Opinion No. 514,* 137 F.E.R.C. ¶61,029

- 22 -

(2011), ¶54. [J.A. ___]. FERC ruled that a party wishing to challenge the cost inputs would have to seek a change in the formula: "If any entity wants to change the depreciation rates used in the formula, it must seek a modification to the bandwidth formula in a section 205 or 206 filing." *Id.,* ¶52. [J.A. ___].

In *Opinion No. 505-A,* FERC relied on its tariff interpretation in *Opinion No. 514* that the formula requires the use of retail-set depreciation rates. 139 F.E.R.C. ¶61,103 (2012), ¶¶50-51. [J.A. ___]. FERC also rejected the contention that the depreciation rates violated the FERC policy requiring the allocation of depreciation expense over the service life of the property. FERC ruled that the depreciation rates are "systematic and rational." *Id.,* ¶52. [J.A. ___]. Although the "primary objective of recording depreciation expense is to allocate the consumption of an asset's service value over its remaining useful life," FERC held that systematic allocations over grossly incorrect service lives is sufficient. *Id.*

After the issuance of *Opinion No. 505,* the LPSC did file a complaint on depreciation. The LPSC relied on depreciation studies prepared by Entergy to implement the judge's decision in the Second Bandwidth Proceeding, which showed that Entergy's depreciation estimates were grossly erroneous and inaccurate for virtually every generator in the fleet. After a hearing, FERC rejected the Complaint, holding that the erroneous inputs and their effect on rates was not a

- 23 -

basis to change the formula. *See Opinion No. 519,* 139 F.E.R.C. ¶61,107 (2012), ¶42. [J.A. ___]. FERC ruled that conflicts with FERC policy and the FERC accounting rule were insufficient; instead, the use of retail-prescribed depreciation rates are "just and reasonable as a matter of law" regardless of rate impacts. *Id.,* ¶¶112, 113, 119. [J.A. ___]. FERC also ruled that because of the Bandwidth Formula, Entergy does not have to comply with the accounting regulation. *Id.,* ¶¶112, 113. [J.A. ___].

FERC also has *disapproved* retail-prescribed depreciation rates for the other Service Schedules in the System Agreement, but held that they are still to be used for the Bandwidth Calculation. FERC rejected a new depreciation rate for the ANO 2 unit in Arkansas and substituted its own, and rejected new rates approved by the Public Utility Commission of Texas and replaced them with FERC-approved rates. *Opinion No. 523,* 142 F.E.R.C. ¶61,022 (2013), ¶126, 198, [J.A. ___]; *Opinion No. 526,* 143 F.E.R.C. ¶61,116 (2013), ¶¶34, 88, [J.A. ___]. These are the "just and reasonable" depreciation rates approved by FERC, but FERC held they may not be used in the Bandwidth Formula.

   ***b.   Compliance with ETR-26/ETR-28 methodology.*** Although FERC ruled in the Compliance Proceeding that Entergy could not change the ETR-26/ETR-28 methodology, FERC held in this case that Entergy did change the methodology in that proceeding, and it approved the changes. Entergy used an

- 24 -

"Energy Ratio" for allocating responsibility for "Variable" production costs that excluded opportunity sales made by EAI, although Exhibits ETR-26 and ETR-28 included those sales in allocating cost responsibility.  FERC ruled that the filing in the Compliance Proceeding "is now the lawful rate, and takes precedence over any conflict with the methodology found in Exhibits ETR-26 and ETR-28."  *Opinion No. 505,* ¶133.  [J.A. ___].  In *Opinion No. 505-A,* FERC ruled that Entergy's failure to mention the change in its Filing Letter did not void the change to the tariff.  *Opinion No. 505-A,* ¶13.  It ruled that "[a]dmittedly, the proper venue for Entergy to make the change to the Energy Ratio variable should have been through a separate Section 205 filing," and even though the change was never mentioned in the *Compliance Orders,* the change still became "the filed lawful rate."  *Id.,* ¶14.  [J.A. ___].

  **c.**  ***After-the-fact ruling on Capital Lease ADIT.***  Entergy also asserted that the Compliance Filings provided it the discretion to choose which categories of ADIT to include in the Bandwidth Calculation, regardless of those included in Exhibits ETR-26 and ETR-28.  The tariff states that amounts "not generally and properly includable for FERC cost of service purposes" should be excluded.  *Opinion No. 505,* ¶233.  [J.A. ___].  Entergy excluded dozens of ADIT categories, although FERC had approved their inclusion in *Opinion No. 480.*  The LPSC challenged these exclusions, arguing "only ADIT amounts related to SFAS 109

may be excluded from the bandwidth calculations, consistent with Exhibits ETR-26 and ETR-28." *Id.* FERC ruled that the tariff permitted the change in methodology. It noted that the LPSC did not challenge specific exclusions, except for the exclusion of ADIT for Net Operating Losses ("NOLs"). *Id.,* ¶¶233-34. [J.A. ___]. The LPSC raised the NOL ADIT issue as an example because it was the largest amount and was improperly excluded based on retail ratemaking. [LPSC Brief on Exceptions, 34-35]..[J.A. ___]. FERC rejected Entergy's exclusion of the NOL ADIT. *Opinion No. 505,* ¶234. [J.A. ___].

In the Second Bandwidth Proceeding, the LPSC challenged the exclusion of the Waterford 3 Sale-Leaseback ADIT. The Sale-Leaseback is treated as a Capital Lease at FERC, but the transaction is ignored for retail ratemaking. The judge in that proceeding found that the issue was not litigated in this case, reasoning that it was not mentioned in the findings of the Initial Decision. *Initial Decision,* 128 F.E.R.C. ¶63,015 (2009), ¶317. [J.A. ___]. FERC's Orders did not mention it either. The judge ruled that the Capital Lease ADIT could not be excluded because it is generally and properly includable for FERC cost-of-service purposes. *Id.,* ¶324. [J.A. ___].

In *Opinion No. 514,* FERC ruled that the issue was decided in this case and that a stipulation of the parties agreeing not to relitigate issues precluded its relitigation in the Second Bandwidth Proceeding. As its basis for determining

- 26 -

that the issue was litigated, FERC relied on the fact that the *Initial Decision* cited testimony in which witnesses for Entergy and the Mississippi Public Service Commission ("MPSC") gave reasons for excluding various ADIT amounts.  FERC found that the Capital Lease ADIT was excluded based on the *retail ratemaking treatment*.  *Opinion No. 514,* ¶¶118-19.  [J.A. ___].  On rehearing, FERC conceded that this basis for excluding ADIT would be erroneous, but still determined that the Capital Lease ADIT issue was barred under the stipulation.  *Opinion No. 514-A,* ¶25 (decision may have "ruled on the exclusion of the Waterford 3 ADIT on an incorrect premise. . . .").  [J.A. ___].

The LPSC did not seek rehearing on the Capital Lease ADIT issue in this case, because FERC gave no indication in this case that it decided the issue. The LPSC did not learn that FERC would treat the ruling in this case as a determination of the issue until FERC issued *Opinion No. 514.*  The LPSC seeks judicial review here because FERC has now held it was decided in this case and there was "a reasonable ground" for failure to raise the issue on rehearing.  16 U.S.C. § 825l(b).

## SUMMARY OF THE ARGUMENT

1.    *Depreciation.*    FERC's ultimate determination here, based on *Opinion No. 514,* that the Bandwidth Formula vests authority in retail agencies to establish depreciation rates for a wholesale cost allocation tariff, is an unlawful

- 27 -

subdelegation of authority granted by Congress.  Absent statutory authorization, an

agency cannot subdelegate its authority.  FERC's ruling abdicates jurisdiction over

a major portion of the cost inputs that enter a FERC cost allocation rate and

permits retail agencies to affect the rates in an unduly discriminatory manner.

Depreciation rates are cost *estimates* that allocate the recognition of

costs over time.  If one jurisdiction uses a fast method of depreciation and another

a slow method, the inconsistency distorts a calculation designed to compare

production costs and achieve a lawful allocation.  Here, FERC did not dispute that

the retail depreciation rates produce undue discrimination or that they conflict with

FERC policy. To avoid correcting the discrimination, FERC ruled that the tariff

vests the wholesale ratemaking responsibility in retail agencies, who set

depreciation to achieve their own parochial objectives and in response to Entergy's

requests.  Here, this subdelegation enabled Entergy to minimize EAI's bandwidth

payments by delaying the recognition of the ANO service life changes.

FERC's interpretation conflicts with its own jurisdiction and

principles of tariff interpretation.  FERC reversed its tariff interpretation without

adequate explanation.   FERC repudiated its own ratemaking policies and

substituted inconsistent retail policies.  FERC never explained how an unjust and

unreasonable rate impact can be ignored.  FERC's accounting ruling is irrational

and discriminatory because it ignores the service lives of the assets.

- 28 -

FERC's reversal of its directives to litigate the justness and reasonableness of depreciation costs and other cost inputs in Bandwidth Proceedings is arbitrary. FERC's ruling that unjust and unreasonable inputs cannot be adjusted departs from FERC policy. Under the Federal Power Act, FERC cannot approve a formula that preapproves future cost inputs, sight unseen. FERC did not explain its departure from policy or justify its pre-approval of retail-set rates. FERC's decision cuts off rights and effectively eliminates any consumer remedy for unjust and unreasonable cost inputs.

       **2.**     ***Retroactive rule change and approval of tariff change without statutory notice.***  In the Compliance Proceeding*,* FERC ruled that *Opinion No. 480* determined all elements of the rough equalization formula and this Court affirmed. FERC ruled that neither Entergy nor any other party could obtain a change in the ETR-26/ETR-28 methodology in the Compliance Proceeding. In its second Compliance Filing, Entergy stated that its tariff did replicate the ETR-26/ETR-28 methodology, even in the smallest detail. FERC's ruling here, that Entergy changed the Energy Ratio in the Compliance Filing, constitutes an unlawful retroactive change in the rules, to the prejudice of a party. The tariff change is also void for lack of notice; no reasonable party could have understood that Entergy intended a change in the Energy Ratio based on the Filing Letters or the tariff.

1163681v.1

FERC's retroactive application of the tariff change is prohibited retroactive ratemaking.

      **3.**    ***Exclusion of Waterford Capital Lease ADIT.***    FERC's purported exclusion of the Capital Lease ADIT in this case based on the retail ratemaking treatment violates the tariff language and the Exhibit ETR-26/ETR-28 methodology. The retail treatment is irrelevant to the determination of what ADIT is "generally and properly includable for FERC cost of service purposes." At FERC, the Sale-Leaseback is treated as a Capital Lease and the Capital Lease and its costs are included in the Bandwidth Formula; for retail ratemaking, the Sale-Leaseback is treated as if it never occurred. FERC's ruling is arbitrary.

## STANDING

      The LPSC is a state agency with authority to regulate the retail rates of two of the Companies. The LPSC brought the complaint that led to the enactment of the Bandwidth Formula and was an intervenor in the FERC proceeding. 16 U.S.C. § 825l(b) provides the LPSC with standing to seek review of FERC's Orders.

## STANDARD OF REVIEW

      The Court reviews FERC decisions to determine if they are contrary to law or arbitrary. FERC cannot subdelegate authority vested in it by the Federal Power Act. FERC may not retroactively change its rules to the detriment of a

- 30 -

party. FERC must reasonably explain departures from policy or precedent. *United States Telecom Ass'n v. F.C.C.,* 359 F.3d 554 (D.C. Cir. 2004); *Handley v. Chapman,* 587 F.3d 273, 283 (5th Cir. 2009); *Louisiana Public Service Comm'n v. FERC,* 184 F.3d 892, 897 (D.C. Cir. 1999).

## I.     FERC'S DEPRECIATION RULING IS UNLAWFUL AND ARBITRARY.

### A.     FERC'S Decision to Vest Authority in Retail Regulators to Set Depreciation Rates for the Companies they Regulate in the Wholesale Cost Allocation Tariff Is an Unlawful Subdelegation of FERC's Power.

*Opinion No. 505-A* holds that the Bandwidth Tariff "require[s] depreciation rates approved by retail regulators to be reflected in calculations implementing the bandwidth formula." *Opinion No. 505-A,* ¶48, n.84. [J.A. ___]. FERC also ruled that if retail regulators change the depreciation rates, the changed expenses may enter the formula and are not subject to FERC review. *Id.* The only way to change unreasonable depreciation inputs is to challenge the formula in a Section 205 or 206 proceeding. *Id.,* ¶50. [J.A. ___]. This action constitutes an impermissible subdelegation of authority vested in FERC by Congress.

FERC has exclusive jurisdiction pursuant to the Federal Power Act to regulate all aspects of the bandwidth calculation. 16 U.S.C. § 824d, e. As this Court held in *Mississippi Industries v. FERC,* 808 F.2d 1525, 1547 (D.C. Cir. 1987), *vacated in part on another issue,* 822 F.2d 1103 (1987), FERC has

- 31 -

exclusive jurisdiction over the wholesale transactions on the Entergy System. The United States Supreme Court has also held that FERC has exclusive and preemptive jurisdiction over Entergy's wholesale cost allocation tariffs. *Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354 (1988).

In these cases and in the Second Bandwidth Proceeding, however, FERC interpreted the Bandwidth Formula as precluding it from adjusting retail-approved depreciation expenses for use in a FERC-approved tariff. FERC refused to examine the reasonableness of the inputs or the impact on rough equalization. Thus, inconsistent retail methods establish major components of the costs entering the Bandwidth Formula. Further, FERC refused to examine the impact of grossly inconsistent and erroneous depreciation inputs in the subsequent LPSC complaint proceeding. *Opinion No. 519,* ¶42; [J.A. ___]. It affirmed an Initial Decision that held: a) the use of incorrect service lives was not a basis to change the tariff; b) the use of inconsistent methods does not make the tariff unjust and unreasonable; and c) conflicts with FERC policy and its accounting regulation were an insufficient basis to change the formula. *Initial Decision,* 134 F.E.R.C. ¶63,016 (2011), ¶¶28-30. [J.A. ___]. In light of FERC's prior bandwidth decisions, that judge ruled the retail-set depreciation inputs are "*Per Se just and Reasonable*" under the tariff. *Id.* at 27; [J.A. ___].

1163681v.1

The courts have determined that power vested in a federal agency by Congress may not be subdelegated to state agencies. For instance, in *United States Telecom Ass'n. v. FCC,* 359 F.3d 554 (D.C. Cir.), *cert. denied,* 543 U.S. 925 (2004), this Court held that a federal agency may not subdelegate its jurisdictional responsibility to an outside agency:

> We therefore hold that, while federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities -- private or sovereign -- absent affirmative evidence of authority to do so.

*Id.* at 566.

The Fifth Circuit reached a similar conclusion in *Texas Office of Pub. Util. Couns. v. FCC,* 265 F.3d 313 (5th Cir. 2001). There, the FCC failed to exercise its own independent judgment in establishing an amount required for a universal service fund. The FCC had relied on a range of estimates provided by outside parties. The Court said: "An agency abdicates its role as a rational decision-maker if it does not exercise its own judgment, and instead cedes near-total deference to private parties' estimates." *Id.* at 328.

FERC itself has found that it could not subdelegate its authority in rejecting an Entergy request to accept the prudence determinations of state regulators for the Bandwidth Formula. It said:

- 33 -

> The Commission's ratemaking obligations under the FPA
> cannot be delegated to a state commission. Similarly, as
> a general matter, a state commission cannot set
> Commission-jurisdictional rates nor direct the filing of
> Commission-jurisdictional rates. . . .

*Entergy Services, Inc.,* 120 F.E.R.C. ¶61,020 (2007), ¶28. The judge in the Second

Bandwidth Proceeding ruled similarly regarding depreciation. He said: "There is

nothing in the Act which allows the Commission to delegate this responsibility to

any person or body politic." 128 F.E.R.C. ¶63,015 (2009), ¶211 .

FERC has not claimed the ability to subdelegate its ratemaking

authority. Instead, it asserted that placing authority in retail regulators is not a

delegation because FERC decided to do it. *Opinion No. 514-A,* ¶17 ("Such

specification and incorporation of retail regulator-approved depreciation rates has

been reviewed and accepted by the Commission. . . ."). [J.A. ___]. But that is the

point -- FERC decided to delegate. An agency delegates when it shifts to another

party "almost the entire determination of whether a specific statutory

requirement -- impairment -- has been satisfied." *U.S. Telecom,* 359 F.3d at 567.

Here, there is no "almost." FERC's rationale does not make the delegation

disappear.

- 34 -

**B.  FERC's Reversals Regarding the Tariff and the Ability to Review the Justness and Reasonableness of Costs Conflicts with the Statute, FERC's Prior Interpretations, and FERC Policy on Formula Rates.**

FERC originally held that the justness and reasonableness of all costs entering the Bandwidth Formula should be reviewed in Bandwidth Proceedings. The ability to review the *cost inputs,* either in an annual proceeding or in a Section 206 proceeding with retroactive application, is the central justification for formula rates, which permit rate changes as costs change without the notice required under the Federal Power Act.  FERC also initially interpreted the tariff as permitting FERC review of depreciation inputs.  But FERC reversed course after the fact so that it would not need to correct depreciation rates that preserve unduly discriminatory cost disparities.  FERC's determination unlawfully conflicts with its own statutory jurisdiction.

The judge's findings in this case, with which FERC took no issue, leave no doubt that the retail-set depreciation rates are unjust and unreasonable in the Entergy cost allocation tariff.  The Bandwidth Formula *compares* the costs of the Companies and shifts costs to ensure that all are within a +/- 11 percent bandwidth.  If the *cost estimates* used in the formula are set in an inconsistent and inaccurate manner, the cost allocation will not be correct and the tariff cannot accomplish its purpose.  As the judge ruled, EAI's nuclear depreciation "is unjust

- 35 -

and discriminatory because it moves artificial depreciation costs into the period in which EAI expects the Bandwidth to exist and artificially lowers depreciation costs thereafter."  [I.D., ¶694].  [J.A. ___].  Further, he found that "the APSC's failure to readjust the depreciation expenses when the NRC granted the license extension does not comport to any reasonable accounting standard or established FERC precedent. . . ."  [*Id.,* ¶483].  [J.A. ___].  FERC explicitly took "no issue" with the finding that "adjusting the depreciation rates of ANO 1 and ANO 2 would be more equitable for ratepayers. . . ."  *Opinion No. 505,* ¶172.  [J.A. ___].

FERC's ruling that the formula precludes adjusting the inputs eliminates the core justification for the legality of formula rates.  Section 205 of the Federal Power Act provides that "no change shall be made by any public utility in any such rate . . . except after sixty days' notice to the Commission and to the public."  16 U.S.C. § 824(d).  FERC may waive the sixty-day requirement, but if it does it shall specify "the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published."  *Id.*  The burden of proof to justify the rates "shall be on the public utility."  16 U.S.C. § 824d(e).

FERC has waived the notice requirement in approving formula rates, but only because its approval of the formula is not an approval of the changing *cost inputs* that enter the formula or the resulting dollar-and-cent rates.  *See Public Utility Comm'n of the State of California v. FERC,* 254 F.3d 250 (D.C. Cir. 2001)

- 36 -

("*CalPUC*").  FERC reserves the right of parties to challenge cost inputs and the resulting rates, either in an annual proceeding such as the Bandwidth Proceedings, or through Section 206 challenges.  If a Section 206 challenge is successful, the dollar-and-cent rates can be modified retrospectively.  *Id.* at 258:  "Because relief can be sought pursuant to § 206 in the event a pass through of non-jurisdictional RMR costs results in unjust and unreasonable rates, the Commission's acceptance of ISO's formula rates without additional § 205 filings does not leave *CALPUC* or ratepayers without statutory recourse."

FERC policy on formula rates makes clear that ratepayers can be protected from unjust and unreasonable cost inputs, either through up-front filings or pursuant to Section 206.  In *Public Service Electric and Gas Co.,* 124 F.E.R.C. ¶61,303 (2008), FERC ruled that parties can contest cost inputs into a formula rate whenever the inappropriate costs are discovered and the utility continues to "bear the ultimate burden of proof, *i.e.* to demonstrate the justness and reasonableness of the changes resulting from application of the formula rate."  *Id.,* ¶17.  Further, "[t]he Commission's policy applies to *all formula rates, regardless of type.*"  *Id.*, ¶20 (emphasis added).  In *American Electric Power Service Corp.,* 124 F.E.R.C. ¶61,306 (2008), FERC said its "long-standing precedent is that, under formula rates, parties have the right to challenge the inputs to or the implementation of the formula. . . ."  *Id.,* ¶35.

- 37 -

For the Bandwidth Formula, however, FERC has ruled that a party may not challenge the cost inputs in *any* proceeding. The party can only secure prospective, after-the-fact relief by seeking to change the formula rate. With respect to depreciation, FERC ruled that the Bandwidth Formula's "definitions of those depreciation variables require depreciation rates approved by retail regulators to be reflected in calculations implementing the Bandwidth Formula." *Opinion No. 505-A,* ¶48 n.84. [J.A. ___]. It also determined that, contrary to the policy requiring utilities to file for approval whenever changes in depreciation rates enter wholesale rates, "it is unnecessary for Entergy . . . to seek approval to include revised depreciation rates adopted by any of its retail regulators in the bandwidth formula. . . ." *Id.*

In order to change the depreciation inputs, "[t]he Louisiana Commission may file a section 206 proceeding to change the bandwidth formula; indeed it has done so." *Id.,* ¶50. [J.A. ___]. But a change in *the formula* can only apply prospectively. FERC ruled in the LPSC complaint case that even if it deemed a change appropriate, FERC would not permit retroactive relief. *Opinion No. 519,* ¶26. [J.A. ___].

FERC's decision to bar any evaluation of the reasonableness of the depreciation cost inputs conflicts with the statutory notice requirement. FERC holds that retail regulators may revise retail depreciation rates and distort

- 38 -

wholesale cost allocations with impunity.  An aggrieved party can never change rates once they are assessed and must carry the burden of proof to change the formula before FERC will even look at the issue.  Denying advance notice of rate changes and holding they will not be subject to retroactive correction conflicts with Section 205(d).  *See CalPUC,* 254 F.3d 250 (D.C. Cir. 2001).  Further, the shift in burden, requiring a party to show that the formula *and* the inputs are unjust and unreasonable, violates section 205(e).  16 U.S.C. § 824d(e).

FERC's decision also is an unexplained departure from its policy on formula rates.  FERC may not rule inconsistently with its own precedents and policy without a persuasive explanation.  *Louisiana Public Service Comm'n v. FERC,* 184 F.3d 892, 897 (D.C. Cir. 1999).  FERC here first said it could adjust the inputs, but would not do so in a Bandwidth Proceeding, after holding that it *would do so* in Bandwidth Proceedings.  On rehearing, FERC said that it had changed its interpretation of the tariff so as to preclude any adjustments.  *Opinion No. 505-A,* ¶48 n.84.  [J.A. ___].  But FERC has *never* explained why its policy, which as of 2008 was applicable "to all formula rates," is not applicable to *this* formula rate.  *Public Service Electric and Gas Co.,* 124 F.E.R.C. ¶61,303 (2008), ¶20.

In contrast to the situation in *CalPUC,* FERC's determinations do leave the LPSC and consumers without any statutory recourse.  *CalPUC,* 254 F.3d

- 39 -

at 258. FERC effectively ruled that in adopting the formula, FERC preapproved all future depreciation inputs established by retail regulators regardless of unduly discriminatory distortions of the wholesale cost allocation. FERC's ruling conflicts with the language and purpose of the Federal Power Act. *Municipal Light Bds v. FPC,* 450 F.2d 1341, 1348 (D.C. Cir. 1971), *cert. denied,* 405 U.S. 989 (1972) (Act's "primary aim is the protection of consumers from excessive rates and charges.").

### C.   FERC's Determination Is an Unlawful Retroactive Change in Procedure That Prejudices the LPSC.

FERC initially determined that it set up the Bandwidth Proceedings so that all parties could examine the cost inputs to ensure that "all such costs are just and reasonable and prudently incurred." *Arkansas Public Service Comm'n v. Entergy Services, Inc.,* 119 F.E.R.C. ¶61,223 (2007), ¶47. In setting this case for hearing, FERC said that the rates "necessarily will be based on underlying cost inputs and the reasonableness thereof. . . ." *Entergy Services, Inc.,* 120 F.E.R.C. ¶61,094 (2007), ¶16. FERC dismissed the LPSC's 2008 complaint on depreciation, holding that the issue should be resolved in this Bandwidth Proceeding. *Louisiana Public Service Comm'n v. Entergy Corp.,* 124 F.E.R.C. ¶61,010 (2008), ¶27.

In 2010, FERC issued *Opinion No. 505,* holding for the first time that the reasonableness of cost inputs could not be contested in Bandwidth Proceedings,

- 40 -

and requiring a complaint seeking to change the formula in a "future section 205 or 206 proceeding." *Opinion No. 505,* ¶173.  [J.A. ___].  FERC cut off remedies for the preceding three years, because it later ruled that a complaint could not have retroactive effect.  This retroactive change in FERC's procedural rule was unlawful.

In *Pacific Molasses Co. v. Federal Trade Comm'n,* 356 F.2d 386, 390 (5th Cir. 1966), the Fifth Circuit held that once an agency establishes a procedural rule to govern proceedings, its action in violation of the rule "cannot stand."  *See also Handley v. Chapman,* 587 F.3d 273, 283 (5th Cir. 2009) (citing rule); *United States ex rel Accardi v. Schaugnessy,* 347 U.S. 260 (1954).  Further, an agency cannot give retroactive application to a new rule announced for the same case unless prejudice to a party is substantially outweighed by the public interest.  *McDonald v. Watt,* 653 F.2d 103, 1044 (5th Cir. 1981); *NLRB v. E&B Brewing Co.,* 276 F.2d 594, 600 (6th Cir. 1960).

Here, FERC has not cited any public interest in denying review of allegedly unjust and unreasonable depreciation inputs.  FERC's only rationale is an unexplained reference to "experience in addressing these annual bandwidth filings." *Opinion No. 505-A,* ¶48.  [J.A. ___].  FERC does not even disclose what the "experience" revealed, other than the need to decide an issue that FERC, for whatever reason, found distasteful.  The ruling is arbitrary.

- 41 -

### D.     FERC's Refusal to Apply Its Accounting Rule Is Arbitrary.

The findings of the judge, based on the testimony of a former Chief Accountant at FERC, determined that Entergy's nuclear depreciation rates violate the FERC's accounting instruction for depreciation.  [I.D., ¶¶469-89]. [J.A. ___]. The regulation requires that utilities depreciate the service value of depreciable property "in a systematic and rational manner" over the "service life of the property."  18 C.F.R. Pt. 101, *Gen'l Instr.* 22(A).  It also requires that "service lives of depreciable property must be supported by engineering, economic or other depreciation studies."  *Id., Gen'l Instr. 22(B).*  For nuclear plants, FERC policy requires that the service life be determined by the NRC license life.  [*See* I.D., ¶¶447-48]. [J.A. ___].

FERC's rulings cut off any inquiry into the justness and reasonableness of cost inputs, but permitted an inquiry into whether the inputs conform to "the applicable accounting rules."  *Opinion No. 505-A,* ¶50.  [J.A. ___]. In ruling on Entergy's accounting, FERC held that the straight-line method Entergy uses is a "systematic method," but never acknowledged that the method is "systematic" over a grossly inaccurate service life.  *Opinion No. 505-A,* ¶52.  [J.A. ___].  FERC failed to address the judge's findings, address the service life point, or refute the testimony of the Staff accounting witness.  The decision thus is irrational.

- 42 -

In *Opinion No. 519,* FERC justified the accounting violation on a different basis. It said that because of the Bandwidth Formula, the retail-approved depreciation rates automatically comply. *Opinion No. 519, ¶¶*112, 113, 119. [J.A. ___]. This ruling too is irrational and blocks the accounting safeguard for reasonable formula rates.

## II. THE ALLEGED CHANGE OF TARIFF IN THE COMPLIANCE PROCEEDING IS VOID FOR LACK OF NOTICE AND NON-COMPLIANCE WITH THE PROCEDURAL RULE ESTABLISHED FOR THE COMPLIANCE PROCEEDING.

In *Opinion No. 480,* FERC adopted the methodology in Exhibits ETR-26 and ETR-28 to govern the cost comparison among the Companies. *Opinion No. 480, ¶*33. [J.A. ___]. In the Compliance Proceeding, FERC ruled that no adjustments would be made to the Exhibit ETR-26/ETR-28 methodology, even to correct an error or enforce the parties' agreement in the underlying case. *Compliance Order, ¶*69. [J.A. ___]. In its Second Compliance Filing, Entergy assured FERC that its revised formula complied with the Exhibit ETR-26/ETR-28 methodology in all respects, and FERC accepted the filing as in compliance with its requirement. *Compliance Rehearing Order, ¶¶*48-50. [J.A. ___]. But in this case, FERC held that the Compliance Filing changed the basis for calculating the Energy Ratio for allocating variable costs and enforced the change. *Opinion No. 505, ¶*137. [J.A. ___].

- 43 -

FERC determined that Entergy's Bandwidth Calculation changed the formula for determining the Energy Ratio. The Energy Ratio in those exhibits included "opportunity sales" made by EAI, but in the Bandwidth Calculation these sales were excluded. FERC "[a]dmitte[d]" that "the proper venue for Entergy to make the change to the Energy Ratio should have been through a separate section 205 filing." *Opinion No. 505-A,* ¶13. Entergy did make such a filing in 2008, but that filing could not affect the 2007 Bandwidth Calculation. *Id.,* n.27. [J.A. ___]. Despite the finding of a change in methodology, FERC ruled that the change "was accepted through the November 2006 and April 2007 Compliance Orders and it is now the filed rate." *Opinion No. 505-A,* ¶13. [J.A. ___].

This is a change to the formula rate approved by FERC in *Opinion No. 480,* allegedly inserted into the tariff in defiance of FERC's *Compliance Order.* Under Section 205(d) of the Federal Power Act, it cannot be effective without a notice that states "plainly the change or changes to be made in the schedule. . . ." 16 U.S.C. § 824d(d). FERC's regulations require the transmittal letter for a rate filing to "explain any changes to the carrier's rates, rules, terms or conditions of service; . . ." 18 C.F.R. § 341.2(c). Here, Entergy never mentioned a change in the Energy Ratio, and its *Second Compliance Filing* letter stated that "the Tariff has been revised to reflect the methodology reflected in Exhibits ETR-26 and

ETR-28."  [LC-303 at 6].  [J.A. ___].  FERC accepted this assurance.  *Compliance Rehearing Order,* ¶¶48-50.  [J.A. ___].

FERC ruled summarily that the notice was adequate because the tariff itself, filed in a proceeding in which changes were prohibited, provided notice of the change.  It held, without citation, that a tariff change "not fully described in the transmittal letter does not void a change to the tariff."  *Opinion No. 505-A,* ¶13.  [J.A. ___].

The new tariff provided that the Energy Ratio would be:

Each Company's Annual Energy (Net Area Requirements Less Non-Requirements Sales for Resale) Divided by the Sum of all Companies Annual Energy (Energy Ratio).

[ESI-4 at 481].  [J.A. ___].  FERC ruled that the LPSC should have realized that the opportunity sales were "Non-Requirements" sales and protested the change in the Compliance Proceeding.  *Opinion No. 505,* ¶136.  [J.A. ___].  But the LPSC relied on Entergy's assertion of compliance and could not possibly have divined Entergy's intent from the tariff language.  As the LPSC showed, and Entergy conceded, Entergy prior to the Compliance Proceeding had steadfastly maintained that EAI's opportunity sales were "requirements" as that term is used in the System Agreement.

As Entergy witness Louiselle conceded, "Entergy has always included individual company sales in the companies' requirements as that word is used in

- 45 -

the system agreement."   [Tr. 1082-1083; *see also,* LC-185 (depo. of Entergy witness Salley Rainer) at 75-88 (testifying that the term "requirements" as used throughout the System Agreement includes individual company opportunity sales)].   [J.A. ___].   LPSC witness Stephen Baron also testified that in Docket ER03-583, Entergy contended that off-system opportunity sales made by EAI were part of EAI's "requirements."   Mr. Baron said:   "In that case, the Company consistently argued that these opportunity sales were, in fact, requirement sales of the EOC making the sale."  [LC-1 at 35].  [J.A. ___].

To discover the change, the LPSC would have to assume that Entergy's Compliance Filing Letters were false, that FERC's requirement of compliance would be waived, years later, and that the term "Requirements" in the tariff meant something different from what Entergy had always contended.  The LPSC never agreed with Entergy's position, but Entergy was the filing party.  Its tariff reference to "Non-Requirements" cannot be deemed adequate notice under the statute.  *Transwestern Pipeline Co. v. FERC,* 897 F.2d 570-580 (D.C. Cir. 1990) ("[W]e can hardly impute adequate notice to Transwestern's customers merely because their lawyers, if put to work on that problem, might have divined a theory reconciling the cases.").  In the absence of adequate notice, the tariff change cannot apply for 2007.

- 46 -

FERC's action is also unlawful because there was no notice that changes could be made in the Compliance Proceeding; indeed, FERC gave notice that changes *could not* be made.  Indeed, in the LPSC appeal of the *Compliance Orders,* FERC explained to the Court that changes to the requirements of an Order are not permitted in compliance proceedings.  Citing authority, FERC said in its brief:

> ("[A] compliance filing is not an appropriate mechanism to challenge Commission directives.") . . . ([T]he "sole relevant issue in review of [a] compliance filing is whether it complies with the direction in the [underlying order]").  [([FERC found] "beyond the scope" of this compliance proceeding issues other than whether Entergy properly implemented the Commission's Opinion Nos. 480 and 480-A directives).

Brief for Respondent, No. 07-1228 at 18-19 (citations omitted).

In *Public Service Comm'n of Kentucky v. FERC,* 397 F.3d 1004, 1006 (D.C. Cir. 2005), then-Judge Roberts authored an opinion holding that "FERC is entitled to deference only if it plays fair. . . ."  In that case, FERC provided a 50 basis point premium to the allowed rate of return without prior notice that it would do so.  Judge Roberts found:

> The Due Process Clause and the APA require that an agency setting a matter for hearing provide parties "with adequate notice of the issues that would be considered, and ultimately resolved at that hearing."  This requirement ensures the parties' right to present rebuttal evidence on all matters decided at the hearing.  In

- 47 -

> addition, the Federal Power Act authorizes FERC to
> approve rate increases only "after full hearings" -- a
> requirement that itself "unquestionably imposes the duty
> to give adequate notice of the subject to which the orders
> pertain."

*Id.* at 1012 (citations omitted). The Court also held that a party's awareness of

FERC's inherent "power to modify rate proposals to ensure that they meet statutory

standards" is not substitute for adequate "notice of the basis for doing so." *Id. See*

*also North Alabama Express, Inc. v. United States,* 585 F.2d 783, 790 (5th Cir.

1978) (notice goes to "jurisdictional validity of agency action."). FERC's

determination is void.

Again, FERC failed to comply with its own procedural rule, to the

detriment of a party. Its action is also unlawful for this reason. *Pacific Molasses*

*Co. v. F.T.C.,* 356 F.2d 386, 389-90 (5th Cir. 1966); *McDonald v. Watt,* 653 F.2d

1035, 1044 (5th Cir. 1981).

## III.   FERC's RULING ON THE CAPITAL LEASE ADIT IS IRRATIONAL BECAUSE FERC COST OF SERVICE DOES NOT MIMIC RETAIL RATEMAKING.

In the Second Bandwidth Proceeding, FERC ruled that it determined

the merits of Entergy's exclusion of the Waterford 3 Sale-Leaseback ADIT in this

case. The Orders in this case, however, contain no indication that FERC ruled on

the issue or even believed it had been litigated. The Initial Decision did not

discuss this ADIT category in its "Findings." But because the Initial Decision

stated that Entergy and the MPSC had provided testimony supporting Entergy's exclusions, FERC held the issue was litigated and decided. *See Opinion No. 514,* ¶¶118-19. [J.A. ___]. The cited testimony stated that the ADIT is not included in retail rates. *Id.* FERC ruled that the issue was barred by a stipulation against relitigating issues entered in the Second Bandwidth Proceeding.

The judge in the Second Bandwidth Proceeding ruled that the issue had not previously been litigated. The judge found that the Initial Decision gave no indication that the issue was decided: "[T]he Waterford 3 Sale-Leaseback ADIT was not specifically mentioned in that section regarding ADIT, and if it was mentioned in testimony in that proceeding, that was not made clear in the decision." *Initial Decision,* 128 F.E.R.C. ¶63,015 (2009), ¶317. He pointed out that FERC policy only bars relitigation when an issue "'was actually litigated and determined. . . .'" *Id.,* ¶321 (citation omitted). He noted that the Bandwidth Formula permits exclusion only of "amounts not generally and properly includable for FERC cost of service purposes; including but not limited to SFAS 109 amounts and ADIT amounts arising from retail ratemaking decisions. . . ." *Id.,* ¶322.

The Capital Lease ADIT did not "arise" from a retail ratemaking decision. The ADIT is unique to the Capital Lease accounting recognized at FERC, all of which is included in the Bandwidth Formula except for the ADIT. The LPSC does not recognize that a Sale-Leaseback transaction ever occurred, nor

- 49 -

does it recognize the Capital Lease accounting.  The Capital Lease asset itself is included in the Bandwidth Formula, which makes the associated ADIT "generally and properly includable for FERC cost of service purposes. . . ."  *Id.,* ¶¶323-25.

FERC said that the Initial Decision in this case excluded the Capital Lease ADIT based on the retail ratemaking treatment, a basis that is irrelevant to the Bandwidth Formula.  *Opinion No. 514,* ¶¶118-19.  [J.A. ___].  But as FERC recognized in ruling on another issue, '[f]or the bandwidth formula what is relevant are the amounts paid by Entergy Louisiana to Evangeline, not the amounts Entergy Louisiana ultimately recovers from its retail ratepayers."  *Id.,* ¶90.  [J.A. ___]. Unless the tariff specifies a retail adjustment, retail ratemaking is irrelevant to the Bandwidth Calculation.  *Id.*

FERC thus ascribed a determination to its rulings in this case that is not mentioned in the Orders and is patently erroneous.  FERC admitted in *Opinion No. 514-A* that the supposed decision "may have ruled on the exclusion of the Waterford 3 ADIT on an incorrect premise. . . ."  *Opinion No. 514-A,* ¶25.  [J.A. ___].  Nevertheless, FERC found the stipulation binding and reversed the judge's decision in that case.

The supposed decision in this case is irrational and arbitrary.  FERC says it excluded the Capital Lease ADIT based on a premise that is admittedly

- 50 -

irrelevant to the Bandwidth Formula. Therefore, the Court should reverse the ruling.

### CONCLUSION

FERC's rulings are unlawful and arbitrary. The Court should instruct FERC to apply its own depreciation policies to the Bandwidth Calculation, enforce the *Compliance Orders,* and overrule the exclusion of the Capital Lease ADIT.

Respectfully submitted,

Brandon Frey                                          */s/ Michael R. Fontham*
Executive Counsel                                 */s/ Noel J. Darce*
Stephen Kabel                                        Michael R. Fontham
Staff Counsel                                          Paul L. Zimmering
Louisiana Public Service Commission      Noel J. Darce
Galvez Building - 12th Floor                   Dana M. Shelton
602 N. Fifth Street                                        Of
Baton Rouge, Louisiana  70802              STONE PIGMAN WALTHER
Telephone:  (225) 342-9888                   WITTMANN L.L.C.
                                                               546 Carondelet Street
                                                               New Orleans, Louisiana  70130
                                                               Telephone:  (504) 581-3200

                                                               *Special Counsel to the Louisiana*
                                                               *Public Service Commission*

## RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Rule 32(a)(7)(b).   It contains 11,216 words.

*/s/ Michael R. Fontham*

*/s/ Noel J. Darce*
Michael R. Fontham

Noel J. Darce

- 52 -

## <u>CERTIFICATE</u>

I hereby certify that copies of the above and foregoing Brief for Petitioner has been served upon the Solicitor of the Federal Energy Regulatory Commission and all counsel of record as listed below through the Court's CM/ECF system or via U.S. Mail, this 21st day of July, 2014.

**Federal Energy Regulatory Commission**

Robert H. Solomon
Lona T. Perry
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC  20426

**Arkansas Public Service Commission**

Randy Hightower
Arkansas Public Service Commission
P.O. Box 400
Little Rock, AR  72203-0000

Dennis Lane
Stinson Leonard Street LLP
1775 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006-4605

**Council of the City of New Orleans, Louisiana**

Daniel Barnowski
Clinton Vince
Jennifer Morrissey
Dentons US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC  20005-3364

**Mississippi Public Service Commission**

Chad Reynolds
Mississippi Public Utilities Staff
P.O. Box 1174
Jackson, MS  39215-1174

- 53 -

**Entergy Services, Inc**.

John Stewart Moot
Matthew Estes
Skadden, Arps, Slate, Meagher
  & Flom, LLP
1440 New York Avenue, NW
Washington, DC  20005

Andrea Weinstein
Entergy Services, Inc.
101 Constitution Avenue, NW
Suite 200E
Washington, DC  20001-0000

**Union Electric Company**

Alan J. Statman
David Scott Shaffer
Wendy Barrett Warren
Wright & Talisman, PC
1200 G Street, NW
Suite 600
Washington, DC  20005-1200

 */s/ Michael R. Fontham*
 */s/ Noel J. Darce*
Michael R. Fontham

Noel J. Darce

- 54 -

# STATUTORY ADDENDUM

## Federal Power Act  16 U.S.C. 824d(d)-(e):

### (d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

### (e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public

- 55 -

utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**18 C.F.R. Pt. 101,** *Gen'l Instr.* **22(A):**

22. *Depreciation Accounting.*
A. *Method.* Utilities must use a method of depreciation that allocates in a systematic and rational manner the service value of depreciable property over the service life of the property.
B. *Service lives.* Estimated useful service lives of depreciable property must be supported by engineering, economic, or other depreciation studies.
C. *Rate.* Utilities must use percentage rates of depreciation that are based on a method of depreciation that allocates in a systematic and rational manner the service value of depreciable property to the service life of the property. Where composite depreciation rates are used, they should be based on the weighted average estimated useful service lives of the depreciable property comprising the composite group.

**18 C.F.R. § 341.2(c)**

 **(c)***Transmittal letter—*

**(1)***Contents.* Letters of transmittal must describe the filing and explain any changes to the carrier's rates, rules, terms or conditions of service; state if a waiver is being requested, and specify the statute, section, regulation, policy or order requested to be waived; and identify the tariffs supplemental numbers, or tariff sections and the proposed effective date of the tariff publication. Carriers must provide to the Commission, in the letter of transmittal accompanying the filing of a tariff publication containing a joint carrier, the address, phone number, and a contact for each joint carrier listed in the tariff publication.

1163681v.1

**(2)** ***Certification.*** Letters of transmittal must certify that the filing has been sent to each subscriber of the tariff publication pursuant to paragraph (a) of this section. For service made on paper, the letters of transmittal must certify that the filing has been sent to each customer or party by first class mail or other agreed-upon means. If there are no subscribers, letters of transmittal must so certify.